IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ARMSTER HAMPTON,

        Petitioner,              Case No. 2:07-cv-00550 ALA (HC)

      vs.

MICHAEL S. EVANS, Warden,

        Respondent.         <u>ORDER</u>

_____/

     Petitioner Armster Hampton filed an application for a writ of habeas corpus in pro se pursuant to 28 U.S.C. § 2254(a) on March 21, 2007.  (Doc. 1).  On September 18, 2007, Petitioner filed an amended application for a writ of habeas corpus in pro se.  (Doc. 15).

     On October 4, 2007, Respondent filed its response to Petitioner's amended application. (Doc. 19).  Petitioner filed a traverse to Respondent's answer on April 22, 2008.  (Doc. 33).

     On August 4, 2008, Petitioner filed a motion in pro se for an evidentiary hearing.  (Doc. 44).  On October 16, 2008, this Court granted Petitioner's motion for an evidentiary hearing. (Doc. 52).  Petitioner filed a motion for the appointment of counsel on October 24, 2008.  (Doc. 53).  This Court granted Petitioner's motion for the appointment of counsel on November 4, 2008.  (Doc. 55).  On November 14, 2008, the Court appointed Henry Chao-lon Su as counsel for Petitioner.  (Doc. 56).  The Court scheduled an evidentiary hearing for February 10, 2009.

(Doc 56). The evidentiary hearing was conducted on that date. (Doc. 71).

In his amended application for a writ of habeas corpus, Petitioner raised seven federal constitutional claims. In its October 4, 2007 answer to the amended application for a writ of habeas corpus, Respondent admitted that Petitioner has exhausted claims one through six before the California Supreme Court. The record supports this concession. Respondent also correctly asserted that Petitioner had failed to exhaust claim seven of his amended application in which he alleged a violation of *Cunningham v. California*, 549 U.S. 270 (2007). That claim was exhausted before the California Supreme Court in a summary denial filed on May 21, 2008. (Case No. S158039).

On May 29, 2008, Petitioner filed a notice of exhaustion of his *Cunningham* claim. (Doc. 34). In its reply to Petitioner's notice of exhaustion, Respondent correctly conceded that Petitioner had exhausted each of the claims set forth in his amended application for habeas corpus relief. (Doc. 36).

For the reasons discussed below, Petitioner's application for a writ of habeas corpus is denied.

**I**

**A**

Petitioner was convicted on June 13, 2003 of second degree robbery and of being a felon in possession of a firearm after a trial by jury in the San Joaquin County Superior Court. He was sentenced to 20 years and 4 months.

**B**

In affirming the trial court's judgment of conviction and sentence, the California Court of Appeal for the Third Appellate District summarized the facts in its unpublished opinion as follows:

> This case involves a less-than-sophisticated robbery of a grocery store early on the afternoon of January 29, 2002. Security guards at the market became suspicious when they spotted an unidentified white male (Suspect 1) loading food

items haphazardly into a cart. Suspect 1 left the store without paying for his cartful of food.

One of the security guards, Matt Bauer, immediately followed and saw that Suspect 1 had wheeled the cart to a Cadillac parked in the handicapped parking space closest to the store. [Petitioner] was holding the cart at the rear of the car and may have been putting items into the back seat. Bauer identified himself and tried to detain Suspect 1, who was walking toward the driver's side of the car. Suspect 1 grabbed onto a pole and struggled against both Bauer and the second guard, Josh Sanders, who had also come outside. The guards told Suspect 1 to stop fighting, but Suspect 1 did not comply.

[Petitioner] approached the struggle, but Bauer told him to drive off and not get involved. [Petitioner] opened the driver's door of the car and Bauer assumed [Petitioner] was going to drive away. Instead, Sanders yelled to Bauer that [Petitioner] had a gun. When [Petitioner] ordered Bauer to let Suspect 1 go, Bauer released his grip, put his hands up, stepped back, and said, "It's cool."

Suspect 1 ran to the passenger's side of the car, got in, and [Petitioner] drove the car away. Bauer and Sanders gave chase on foot, got the license plate number of the car, and called 911.

Police officer Nicky Ezell heard the police radio report and drove to the registered address of the car. Ezell was in plain clothes and in an unmarked car. He parked and kept an eye on the registered address. At approximately 1:50 p.m., [Petitioner] drove up in the Cadillac. He was alone in the car. [Petitioner] stopped for a few moments, then drove to a nearby street. Ezell followed and watched [Petitioner] as he got out of the car and walked toward a house.

Backup support arrived on the scene, and the officers went to the house to look for [Petitioner]. However, [Petitioner] was not there. Ezell returned to [Petitioner's] car and looked inside. He saw pieces of mail addressed to [Petitioner] on the front seat.

Officer Sean Fenner knew [Petitioner] and went to another address to look for him. [Petitioner] was not there, but Fenner took a photograph of [Petitioner] from the house and showed it to Ezell. Ezell immediately identified [Petitioner] as the person he had seen in the car a few minutes earlier.

Ezell returned to the car to impound it. Officers found a loaded handgun under the seat and also found grocery items, including a package of frozen chicken.

Approximately three hours after the robbery, another police officer assembled a six photo line-up with [Petitioner's] picture in it and showed the lineup to Bauer and Sanders, the store security guards. Both immediately identified [Petitioner].

[Petitioner] had been keeping his twice-weekly meetings with his parole officer up until the week before the robbery, but failed to keep subsequent appointments. The parole officer had no contact with [Petitioner] until [Petitioner's] arrest in December 2002, nearly one year after the robbery.

3

At trial, Bauer described the events that he had witnessed. Sanders, the other security guard, did not testify. A surveillance tape from the market's security system was played for the jury. It showed the events that transpired in the store and the parking lot, but [Petitioner] was out of camera range when he was alleged to have drawn a gun on Bauer. Beer bottles with [Petitioner's] fingerprints were found outside the market.

[Petitioner] tendered an alibi defense, claiming to have been at his son's surprise birthday barbecue in a nearby park when the robbery occurred. [Petitioner] challenged the accuracy of the photo identifications and presented testimony from an expert witness who outlined problems associated with eyewitness identifications.

The jury convicted [Petitioner] of robbery and being a felon in possession of a handgun, but was unable to reach a verdict on the enhancement charging personal use of a firearm in the commission of the robbery. The trial court found charged priors to be true, and sentenced defendant to an aggregate prison sentence of 20 years 4 months.

*People v. Hampton*, No. C046365, 2005 Cal. App. Unpub. LEXIS 5373, at *2-5 (Cal. App. 3d Dist. June 22, 2005).

## II

Federal review of a Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. §2254(a) is circumscribed by the Antiterrorism Effective Death Penalty Act of 1996 ("AEDPA") because it was filed after April 24, 1996. *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003); *Furman v. Wood*, 190 F.3d 1002, 1004 (9th Cir. 1999). AEDPA mandates a highly deferential standard for reviewing state court determinations. Under AEDPA, habeas corpus relief is not available for any claim decided on the merits by a state court unless its adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1), "[a] state-court decision is 'contrary to'. . . clearly established [United States Supreme Court] precedents if it 'applies a rule that contradicts the governing law

4

set forth in [Supreme Court] cases,' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Early v. Packer*, 537 U.S. 3, 8 (2002) (citing and quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

Under the "unreasonable application" clause of § 2254(d)(1), a federal court may grant habeas corpus relief if the state court identified the correct governing legal principle from the Supreme Court's decisions, but unreasonably applied that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. A federal habeas court, however, "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *see also Lockyer*, 538 U.S. at 75 (2003) (it is "not enough that a federal habeas court, in its 'independent review of the legal question' is left with a 'firm conviction' that the state court was 'erroneous'")(quoting *Andrade v. Attorney General of California,* 270 F.3d 743, 753 (9th Cir 2001)).

A federal court must look to the last reasoned state court decision as the basis for the state court judgment. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Where the state court reaches a decision on the merits, but provides no reasoning to support its conclusion, a federal court must independently review the record to determine whether habeas corpus relief is available under § 2254(d). *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

### III

### A

Petitioner's first claim is that he "was denied access to and communication with counsel in violation of 6th and 14th amendment to the U.S. Const." Am. Pet. 5. In his Traverse, however, "Petitioner admits that he is not entitled to habeas corpus relief for Ground I of his

1  Federal habeas petition[]." (Doc. 33 at 4). Accordingly, this claim must be denied.

2  **B**

3  Petitioner's second claim for relief is that trial counsel "rendered ineffective assistance of

4  counsel in violation of the 6th Amendment of the U.S. Constitution" by (1) failing competently

5  to advise Petitioner on the merits of the eight-year plea offer and, (2) failing to contact,

6  interview, or compel the presence of Craig Baker as a defense witness. Am. Pet. at 5, 8-16.[1]

7  Ineffective assistance of counsel claims are analyzed under the "unreasonable

8  application" prong of *Williams v. Taylor*. 529 U.S. 362 (2000). *Weighall v. Middle*, 215 F.3d

9  1058, 1062 (9th Cir. 2000). The Supreme Court enunciated the standards for judging ineffective

10  assistance of counsel claims in Strickland v. Washington, 466 U.S. 668 (1984). First, a

11  defendant must show that, considering all the circumstances, counsel's performance fell below

12  an objective standard of reasonableness. *Id*. at 688. To this end, the defendant must identify the

13  acts or omissions that are alleged not to have been the result of reasonable professional

14  judgment. *Id*. at 690. "The court must then determine whether, in light of all the circumstances,

15  the identified acts or omissions were outside the wide range of professional competent

16  ────────────────

17  [1]In the Amended Petition, Petitioner also presented a claim for ineffective assistance of
18  counsel for his trial counsel's failure to challenge the validity of his 1988 prior conviction for
   assault with a firearm. This Court denied this claim in its order of October 16, 2008, granting
19  Petitioner's motion for an evidentiary hearing, because Petitioner's allegations, even if true, fail
20  to state a claim for habeas relief. The United States Supreme Court has held that the federal
   Constitution does not authorize, nor did "Congress intend to permit collateral attacks on prior
21  convictions used for sentence enhancement purposes" unless he or she was denied the right to
22  counsel in the prior proceeding. *Custis v. United States*, 511 U.S. 485, 493 (1994). Petitioner
   has represented by counsel at the July 18, 1988 change of plea hearing, wherein he pleaded no
23  contest to the charge of assault with a firearm in violation of Cal. Penal Code 745(a)(2). Mtn.
24  Evid. Hrg., Ex. L. Thus, Mr. Williams would not have been permitted to challenge the prior
   conviction. Because Petitioner is unable to establish prejudice, he is not entitled to habeas
25  corpus relief on this claim.
26

6

assistance." *Id.*

Second, a defendant "must show that the deficient performance prejudiced the defense." *Id*. at 687. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.; *see also United States v. Murray*, 751 F.2d 1528, 1535 (9th Cir. 1985).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. *Strickland*, 466 U.S. at 697. Since the defendant must prove prejudice, any deficiency that does not result in prejudice must necessarily fail. However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been actual or constructive denial of assistance of counsel or where the State has interfered with counsel's assistance. *Id.* at 692.

**1**

The basis of Petitioner's first ineffective assistance of counsel claim is that his trial counsel failed to advise him to accept an initial plea offer of eight years, made by the prosecutor at the pre-preliminary hearing stage of the same criminal proceedings. Petitioner rejected the offer. He was convicted by a jury and sentenced to a term of 20 years and four months.[2]

---

[2]The "last reasoned decision by a state court" as to this claim was issued by the Superior Court of San Joaquin County which denied Petitioner's claim that his trial counsel's failure to advise Petitioner competently on the merits of the eight-year plea offer constituted ineffective assistance of counsel. *Robinson*, 360 F.3d at 1055 (internal quotations omitted). That court held that

> [the] Petitioner has failed to establish a credible, independently corroborated prima facie showing of a reasonable probability that he would have accepted the plea offer but for his trial counsel's alleged inaccurate advice as to sentencing. For this reason, we conclude petitioner has failed to establish prejudice. Such

7

At the time of his arrest in 2002, Petitioner had six prior felony convictions for which he has served separate prison terms. Of particular relevance here, Petitioner pleaded no contest in 1988 to having violated Cal. Penal Code § 245(a)(2), assault with a firearm in San Joaquin County, a serious felony. Mtn. Evid. Hrg., Exh. L. Petitioner also admitted to a gun use enhancement pursuant to Cal. Penal Code § 12022.5. *Id.* Other charges were dismissed. Petitioner was sentenced to the low term of four years. Petitioner was represented by counsel at the change of plea hearing. *Id.* The court agreed to commit Petitioner to the California Youth Authority for housing. Mtn. Evid. Hrg., Exh. L at 4.

In 2000, Petitioner was charged with the felony possession of a weapon, in violation of Cal. Penal Code § 12021(a)(1), among other crimes. Petitioner appeared at a change of plea hearing on October 24, 2000. He was represented by attorney Robert Williams. Mtn. Evid. Hrg., Exh. E. At the change of plea hearing for this offense, the following colloquy occurred:

| | |
|---|---|
| COURT: | The second charge, sir, is a violation of Section 12021(a)(1) of the Penal Code, possession of a firearm by a felon, same date 10-6 of 2000. What is your plea to that felony charge? |
| DEFENDANT: | No contest. |
| COURT: | Fair enough. That admits it. Is that what you want to do? |
| DEFENDANT: | Yes. |
| COURT: | Finally on this charge of being a felon in possession, do you admit that you were, in fact, a felon because you were previously convicted of a felony violation? We are going to use the violation you have right here - - |
| DEFENDANT: | Yes. |
| COURT: | - - a felony violation of 12021 of the Penal Code on March 4th of 1992 right here in Stockton? |
| DEFENDANT: | No contest. |
| COURT: | Fair enough. That's admitting you have a prior felony |

failure is fatal to his claim that he was deprived of the effective assistance of counsel guaranteed by the federal and California Constitutions.

*In the Matter of the Petition of ARMSTER HAMPTON*, No. SF087198A, Superior Court of County of San Joaquin, July 18, 2005. The state court rejected this contention without an evidentiary hearing.

| | | |
|---|---|---|
| | | conviction. Do you understand that? |
| | DEFENDANT: | Yes. |
| | COURT: | Okay. Now, the other charges and enhancements, which are substantial - - I'm not just saying that, I mean that - - I will dismiss on the D.A.'s motion and recommendation. Fair statement? |
| | MR. MILLER [Prosecutor]: | That is correct. With respect to the Strike enhancement, I have reviewed the transcript of the 1988 plea and there appears to be some difficulty being able to prove that is actually a strike. |
| | COURT: | Well, fair enough. I don't have that transcript. We will dismiss all the remaining enhancements, that includes the Strike - - |
| | MR. MILLER: | Yes. |
| | COURT: | - - on the People's motion and request. |

*Id.*

Petitioner alleges that upon his arrest for the 2002 S-Mart robbery, he retained Mr. Williams to represent him because "Mr. Williams was familiar with [his] criminal history" since he "had previously represented Petitioner in a prior case before the same court, which resulted in a negotiated disposition." Am. Pet. 8. Within a few days of Petitioner's arrest, Mr. Williams met with Timothy Healy, the prosecutor assigned to Petitioner's case. *Id.* Deputy District Attorney Healy offered Petitioner an eight-year sentence in exchange for a guilty plea to the crime of robbery. Petitioner alleges that Mr. Williams advised him not to accept the offer because an eight-year sentence was "too long." *Id.* at 9. Petitioner alleged in his amended application that Mr. Williams advised him to reject the offer and "wait for a better plea offer." *Id.* Petitioner alleged that Mr. Williams "never discussed nor explored with [him] how the sentencing scenario might change were any of [his] priors used to add a strike allegation nor whether a prior strike allegation could be later added to the charges." *Id.* Following the January 16, 2003 preliminary hearing, wherein probable cause was found to hold Petitioner to answer for trial, Petitioner asked Mr. Williams to continue trying to negotiate a better offer. *Id.* On January 27, 2003, Deputy District Attorney Michael Rasmussen filed an information, which was amended on February 4, 2003. *Id.* at 10. The amended information alleged a prior serious felony conviction and charged sentence enhancements pursuant to Cal. Penal Code § 667 and 1170.12. *Id.* Petitioner's

sentencing exposure, if convicted, was over 31 years' imprisonment. *Id.*

Petitioner submitted correspondence between Mr. Williams and Richard Moller, Petitioner's appellate counsel, dated July 28, 2004, with his motion for an evidentiary hearing, wherein Mr. Williams stated:

> Regarding the pre-preliminary examination offer: At the time the district attorney assigned to the case at that point made an offer to Mr. Hampton, no mention was made by anyone that Mr. Hampton had a prior conviction that then, years later, amounted to a strike conviction. I believe that none of us involved in the offer process at that time, neither the district attorney, myself, or Mr. Hampton, then knew that he had an old conviction that amounted to a strike. The offer conveyed to Mr. Hampton was made by the deputy district attorney assigned to the case without any mention to me of a strike conviction. I conveyed the offer to Mr. Hampton without any discussion, or mention, of a strike conviction. Mr. Hampton at that time made no comment about having a strike conviction. . . . Mr. Hampton rejected the pre-preliminary examination offer, stating to me that he thought it was too much, too long, and he thought he could subsequently do better.

Mtn. Evid. Hrg., Exh. H.

On February 10, 2009, this Court conducted an evidentiary hearing on Petitioner's claim of ineffective assistance of counsel during the pre-preliminary hearing plea bargaining stage of the proceedings against him. Petitioner presented the testimony of Timothy Healy, the prosecutor who offered to accept an eight-year sentence in exchange for a plea of guilty prior to the preliminary hearing, and Deputy District Attorney Michael Rasmussen, the prosecutor who alleged a prior serious felony conviction in the information filed after the preliminary hearing. Robert Williams, Petitioner's trial counsel, and Petitioner also testified.

While Deputy District Attorney Healy did not have a specific recollection of the plea negotiations in Petitioner's 2002 case, his testimony was consistent with Mr. Williams's account as described in his letter to Mr. Moller. Deputy District Attorney Healy testified that after reviewing his notes, he knows he offered an eight-year deal to Petitioner's attorney. Evid. Hrg. TR 20. He had no recollection of discussing Petitioner's criminal history with Mr. Williams in connection with the plea offer. *Id.* at 20-21. Deputy District Attorney Healy formulated the offer with Dave Wellenbrick, his supervisor at the time. *Id.* at 21-22. Deputy District Attorney

Healy testified that in making the eight-year offer, he did not take into consideration whether Petitioner had any prior strike convictions because "there was no strike sheet offer . . . in the file." *Id.* at 23. He explained:

> What we have to do when we know that there are defendants who have strikes, it is the policy of our office that the deputy DA signs - - especially at the prelim level and especially back then when I had been in the office for such a short period of time, would have to prepare what's called a strike sheet. Then we would submit it to our supervisor, who was the chief deputy at the time. If the person had two strikes or more, it would have to go in front of the entire strike committee.
>
> This case did not have any notes in there from me at all indicating that he had any charges that would have been considered a strike. That could have been an oversight if he in fact did. I promise you that happened a lot when I was first starting because I had a tough time read - - learning how to read the rap sheet because they were - - they can take little bit of time as a new attorney to understand.
>
> I was unaware given my notes and given looking back at my notes of any strikes that Mr. Hampton had.

*Id.* at 23-24.

Deputy District Attorney Rasmussen testified that Petitioner's case was assigned to him after the preliminary hearing. *Id.* at 39. Deputy District Attorney Rasmussen looked at the case and "saw that Mr. Hampton had a strike." *Id.* at 42. He also testified that there were notes in a file concerning a previous case of Petitioner's from 2000, written by another deputy district attorney "saying that he had looked at the prior strike and that the prior strike was not provable as a strike." *Id.* at 46. It was Deputy District Attorney Rasmussen's view "[t]hat the prior deputy district attorney in 2000 didn't do his job. . . [b]ecause it was a strike, and it was very easy to look at it and determine that it was a strike." *Id.* at 47. When he got the case, Deputy District Attorney Rasmussen "filled out a strike committee form . . . describing the case, describing the priors, describing the prior strike, showing what his exposure was and hand[ed] that to a chief deputy." *Id.* at 42. The strike committee reviewed the file and determined that a plea offer of 20 years was appropriate. *Id.* at 43. Deputy District Attorney Rasmussen testified that Mr. Williams told him that Petitioner would not take an offer of 20 years because he

believed the offer would get better as time went by. *Id*. at 54-55.

Mr. Williams testified that Petitioner was pleased with Mr. Williams's performance on the 2000 case because he received a sentence of only 16 months on a complaint that alleged possession of a controlled substance for sale, felony possession of a weapon, and a prior strike allegation. *Id.* at 70. In the 2000 case, the plea deal was reached before the preliminary hearing took place. *Id.* at 73. When Mr. Williams conveyed the 16-month offer to Petitioner in that case, he accepted the deal immediately and entered an early guilty plea. *Id.* at 76.

Mr. Williams testified that he was retained to represent Petitioner in connection with his arrest in 2002. Mr. Williams testified that he met with Petitioner the night before the preliminary hearing in this matter, talked to him about the plea offer of eight years, his response to the offer, his prior convictions, and his felony strike conviction. *Id.* at 84. Mr. Williams also spoke to Petitioner about "a range of what [he called] max out that he could have gotten," meaning Petitioner's maximum sentencing exposure. *Id.*

The day of the preliminary hearing, Mr. Williams stated that he spoke to Petitioner for about 20 minutes. They discussed submitting a counter offer of four years. *Id.* at 85. "I would have had available a pre-trial services report, and I would have gone over some prison priors. Because you can't get to eight years as he was charged in the complaint, you're going to have to use some of his prison priors to get to eight years. . . . Plus I would have talked to him about the issue of the lack of the strike in this case." *Id.* at 86.

Mr. Williams recalled that "they had [Petitioner] charged in 2000 with a strike and they dismissed it because the district attorney at that time, Mr. Miller, had said they had a problem with the paperwork proving it." *Id.* at 87. Mr. Williams was not certain whether Deputy District Attorney Healy told him, or whether he assumed, that the prosecutor "had the same problem with the paperwork" needed to prove the strike in 2003 and "they weren't going to file it." *Id.* Mr. Williams stated that while he discussed with Petitioner the fact that a strike had not been filed in the complaint, he never told Petitioner that the prosecutor could "never file a strike." *Id.*

at 87-88. Mr. Williams testified he told Petitioner that the decision was his as to whether to accept or reject the eight-year offer. *Id.* at 88. Mr. Williams cautioned Petitioner that "this could get a whole lot worse, there could be a lot more years here involved." *Id.* He also believed that "given what he was charged with, it wasn't all that great an offer." *Id.*

Petitioner's counsel questioned Mr. Williams at the evidentiary hearing before this Court as to why he wrote in his letter to Mr. Moller in 2004 that he conveyed the eight-year offer to Petitioner without any discussion of a strike conviction, but testified at the hearing that he had discussed the prior felony strike conviction with Petitioner in connection with the plea offer. *Id.* at 92. Mr. Williams replied that he had not spent much time thinking about his response when he wrote the letter to Mr. Moller, but had spent some six hours reviewing his files in preparation for his testimony at the evidentiary hearing. *Id.* at 92-93.

Mr. Williams testified that Petitioner told him that the eight-year offer was too high and asked him to make a counter-offer of four years. *Id.* at 94. Mr. Williams conveyed the four-year counter-offer to Deputy District Attorney Healy who rejected it. Petitioner refused to go higher. *Id.* at 99. In reviewing his files, he discovered a letter Petitioner had written to him on January 18, 2003, two days after the preliminary hearing. *Id.* at 104-5; Resp. Evid. Hrg. Exh. AA. In the letter, Petitioner wrote:

> Finally as an option what about the white guy the store detective described, can he be used to get a better deal. Ideally for me would be something like 3 years or less with ½ time running concurrent with my probation and parole violation. <u>No strike and no robbery charge</u>.

Resp. Evid. Hrg. Exh. AA. (emphasis added).

When Mr. Williams conveyed Petitioner's request, Deputy District Attorney Rasmussen refused to consider it. Evid. Hrg. TR 107. On January 30, 2003, when Mr. Williams advised Petitioner that the information alleged the 1988 conviction as a strike and that the plea offer was now 20 years, Petitioner asked Mr. Williams if he could still take the eight-year deal offered by Deputy District Attorney Healy. He was told that the offer was no longer on the table. *Id.* at

137.

Petitioner testified at the evidentiary hearing before this Court that Mr. Williams advised him to reject the eight-year offer made by Deputy District Attorney Healy, which Mr. Williams characterized as a "three-strike deal." *Id.* at 132. Petitioner stated that Mr. Williams told him the offer was too high because the crime he was charged with was a "glorified petty theft." According to Petitioner, Mr. Williams advised him that his maximum exposure at the time "was between 10 and 11 years." *Id.* at 132, 139. Petitioner testified that Mr. Williams never told him he was facing a potential 32-year sentence if convicted. Petitioner testified that "[i]f Mr. Williams had told [him] that [he] had a 1988 prior that was strike, and that [he] was facing a 10-year gun enhancement, that second degree robbery would be [his] second strike under the California three strikes law, [he] would have instantly plead guilty and accepted the eight-year offer as [he'd] done [in] every other instance to resolve [his] criminal issues." *Id.* at 146.

As a threshold matter, in a plea bargaining context, a petitioner must allege in his habeas petition that, "counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). "In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors," the result of the plea bargaining process would have been different. *Id.* Here, that threshold requirement has been satisfied. In his first amended application, Petitioner alleges that, had he "been correctly advised of his potential exposure he would have accepted the 8 years offered by the state." Am. Pet. 10.

After reviewing the evidence submitted by the parties, hearing the testimony and weighing the credibility of the witnesses appearing at the evidentiary hearing, the Court makes the following findings. Mr. Williams was aware that Petitioner's conviction in 1988 for assault with a firearm, great bodily injury, was a "strike" under California law. Evid. Hrg. TR 125. Mr. Williams was aware "that it was a strike in 2000 when [he] handled the case . . . [and] was aware that it was a strike in 2003 pre-prelim, but it wasn't charged." *Id.* at 125-26. None of the

evidence supports a finding, however, that Mr. Williams informed Petitioner during the pre-preliminary hearing plea negotiation that the prosecutor could amend the information to include an allegation concerning the prior strike conviction which would expose Petitioner to a maximum sentence of upward of 31 years. The evidence supports the conclusion that Mr. Williams advised Petitioner that his maximum sentence under the complaint as filed was 10 to 11 years. The Court also finds that Petitioner was aware that his 1988 conviction might be filed against him because he told Mr. Williams in his letter of January 18, 2003 that he wanted Mr. Williams to negotiate a deal with the prosecutor which would involve "[n]o strike." Resp. Evid. Hrg. Exh. AA. The evidence also shows that Mr. Williams advised Petitioner that the plea offer could be taken off the table, and that his sentence exposure "could get a whole lot worse, there could be a lot more years here involved." Evid. Hrg. TR at 88.

Whether Mr. Williams's failure to advise Petitioner of the maximum sentence exposure he could face under an amended information alleging the prior strike conviction constitutes ineffective assistance of counsel need not be decided in this case. While Petitioner's insistence that but for his counsel's alleged error he would have received the benefit of the prosecutor's offer of an eight-year sentence is required to state a claim as a threshold matter, it is insufficient to establish prejudice. Entry of an early guilty plea does not necessarily cut off the prosecution's legitimate right to amend charges. *People v Michaels*, 28 Cal. 4th 486, 513-14 (2002) (upholding court's refusal to accept defendant's guilty plea because Cal. Penal Code § 969.5 specifically authorizes amendment of a complaint to charge prior felony convictions after a guilty plea). Under California law, the prosecutor can amend an information to add prior conviction allegations until the sentence is imposed. *People v Tindall*, 24 Cal. 4th 767, 776 (2000). "[I]f a defendant pleads guilty or nolo contendere, the prosecution may, on the court's order, amend the information to add previously unalleged prior convictions until sentencing." *Id*. at 778 (citing Cal. Penal Code § 969.5(a) and *People v Valladoli*, 13 Cal. 4th 590, 602 (1996) (holding that § 969.5(a) authorized post-verdict, presentencing amendments to charge prior

felony convictions that were previously known, newly discovered, or omitted through clerical error ).  If this were not so, defendants could enter an early guilty plea "thereby limiting the amount of time the prosecutor has to investigate, discover, and charge the accused's prior felony convictions.'" *Id*. at 779 (citing *Valladoli*, 13 Cal. 4th at 602).  Petitioner has failed to demonstrate that had he accepted the offer of an eight-year sentence, and entered an early guilty plea to the original information, there was a reasonable probability he would have escaped a sentence reflecting his prior felony strike conviction.  As set forth above, as soon as Deputy District Attorney Rasmussen was assigned to prosecute this matter, he amended the information when he discovered that he could prove the 1988 conviction as a strike.

Petitioner's documented criminal history which reflected numerous prior felony convictions was available to the prosecutor.  It would not be objectively unreasonable for a state court to infer that the prosecution would have amended the information to pursue a sentence reflecting Petitioner's prior felony strike conviction, even if Petitioner had accepted the initial offer of eight years.

Additionally, in California, "[j]udicial approval is an essential condition precedent to any plea bargain" negotiated by the prosecution and the defense, and a plea bargain is ineffective unless and until it is approved by the court.  *People v. Stringham*, 206 Cal. App.3d 184, 194 (1998); *People v. Orin*, 13 Cal.3d 937, 942-943 (1975).  Petitioner has failed to make any showing that the trial court would have accepted the plea bargain, had Petitioner's counsel advised him to take it, and had Petitioner agreed to take the offer.

Accordingly, the state courts' rejection of Petitioner's claim was not an objectively unreasonable application of *Strickland*.  Under the facts of this case, it simply cannot be said that Petitioner was prejudiced by counsel's alleged shortcomings.  Nor has Petitioner shown that he was prejudiced because he was unable to benefit from the prosecution's erroneous failure to allege the prior felony strike conviction in the complaint and original information.  Deprivation of such a "windfall error" in a defendant's favor is not prejudice under *Strickland*.  *See Lockhart*

1  *v Fretwell*, 506 US 364, 370-72 (1993) (unreliability or unfairness does not result if the

2  ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right

3  to which the law entitles him). Petitioner is not entitled to federal habeas relief on his claim of

4  ineffective assistance of trial counsel during the plea bargaining stage of his proceedings.

5  **2**

6  Petitioner also claims his trial counsel was ineffective for failing to contact Craig Baker

7  to testify as a defense witness.  Petitioner's counsel informed Petitioner on February 24, 2003

8  that his investigator had contacted Craig Baker but was unable to interview him.  Am. Pet. 14.

9  Petitioner offered Baker's handwritten letter to trial counsel, dated August 13, 2003 as an exhibit

10  in support of this contention.  It read as follows:

11    I'm writing you this letter to inform you and Armster that I will not! testify for
      him or <u>lie</u> for him either in court. I do not know anything about his case and do I
12    want to come to court, please leave me alone. Thank you. Respectfully, Craig
      Baker.

13

14  *Id.* at Ex. D (emphasis in original).

15  Petitioner claims that trial counsel's failure to subpoena Baker to court to compel him to

16  testify that he was "the individual depicted in the video and photographic evidence," rendered

17  his attorney's performance ineffective.  *Id.* at 15.  According to Petitioner, Baker would have

18  testified that Petitioner was not with him in the commission of the robbery.  *Id.*

19  On this record, Petitioner has not demonstrated that his trial counsel's performance was

20  unreasonable or ineffective.  Defense counsel wanted his investigator to speak to Baker before

21  he subpoenaed him to testify as a defense witness.  The investigator was unable to interview

22  Baker.  Petitioner has not shown that Baker's testimony would have changed the verdict because

23  the evidence that Petitioner was a participant in the crime was overwhelming.  The afternoon of

24  the robbery, Petitioner was identified  in a photographic line-up by Matthew Bauer, the S-Mart

25  security officer, as the person who participated in the robbery, wielded a handgun, and drove the

26  getaway car.  Petitioner's finger prints were found on beer bottles left at the scene and on the

same day as the robbery. Officer Ezell testified that he witnessed Petitioner driving the vehicle identified by Bauer as the getaway car, some twenty minutes following the robbery. When Petitioner's car was searched on the afternoon of the robbery, police officers found a loaded handgun under the front passenger seat, mail bearing Petitioner's name and address on the front seat, and a package of frozen chicken on the back seat of the car. The brand of frozen chicken was "Pilgram's Pride," the same brand of frozen chicken taken during the robbery. Thus, Petitioner has failed to demonstrate prejudice.

Accordingly, the state court's adjudication of this claim was neither contrary to, nor unreasonable application of Supreme Court precedent under *Strickland*, nor was it based on an unreasonable determination of the facts.

## C

In Petitioner's third claim for relief, he argues that his constitutional rights were violated because he "was denied his right to a nonsuggestive photographic lineup in violation of the 5th and 14th Amend[ments]." Am. Pet 17. He contends that two separate photo identification procedures used by the police in the course of their robbery investigation were overly suggestive. *Id*.

First, Petitioner contends that Officer Ezell's identification of him from a single photo was "highly suspect." *Id*. at 19. Officer Ezell, an officer with eleven years of experience on the City of Stockton police force, testified that on the afternoon of January 29, 2002, he received a radio report that a Cadillac registered at an address on Fiesta Avenue was involved in an armed robbery on March Lane. In an unmarked police vehicle, Officer Ezell responded by going to Fiesta Avenue where he observed the Cadillac described as having been involved in the robbery. The driver of the Cadillac was a heavy-set black male wearing dark clothing and "a blue beanie cap." RT 469. The vehicle stopped at 1607 Fiesta Avenue for a few minutes and then drove away. Officer Ezell followed the vehicle for several blocks and observed the driver of the Cadillac park the car in front of a complex of duplexes. Officer Ezell stopped his vehicle and

observed the driver exit the Cadillac, while facing Officer Ezell's direction, from a distance of approximately 45 feet.  The driver of the Cadillac was walking at his own pace; he was not running.  *Id.* at 478.  Officer Ezell testified that he did not follow the suspect because he was alone, without backup, and he was not wearing a bulletproof vest.  *Id.*  Officer Ezell lost sight of the suspect while waiting for backup.  When backup arrived, a search was made of the apartment Officer Ezell believed the suspect may have entered.  The search was fruitless.  Officer Ezell returned to the Cadillac, saw that the keys were in the ignition and the engine was running.  He searched the front seat area of the vehicle and found several pieces of mail bearing the name of Armster Hampton.  At that time, Officer Ezell received a radio call from Officer Fenner asking him to come to 1607 Fiesta Avenue.  When Officer Ezell arrived at 1607 Fiesta Avenue,  Officer Fenner came out of the residence, showed Officer Ezell a photograph, and asked him "if this was the person that [he] had seen." *Id.* at 486.  Officer Ezell looked at the photo for a few seconds and "it was immediate to [him] that the person in the photograph . . . was the same person [he] had seen walking [from] the vehicle." *Id.*  Officer Ezell made the photo identification approximately ten minutes after having witnessed the driver of the Cadillac exit his vehicle.  *Id.* at 488.

At trial, Office Ezell  identified Petitioner as the person in the photograph.  *Id.*  Officer Ezell testified that he was not given a Simmons admonishment[3] but that he was aware of the instruction and knew it was given to witnesses prior to making photo identifications to inform

---

[3]Officer McBride testified that when he gives a Simmons admonishment to witnesses, he states:

> I [have] a - - a photo to show [you], a line-up.  That the suspect may or may not be in this photo line-up.  They were under no obligation to identify a defendant in this line-up.  It's just as important to set someone free that's not guilty as it is to find the right person.  That they were under no obligations to identify anybody in this photo line-up.

RT 81.

them that the person or persons they are attempting to identify "may or may not be the person . . . [shown] in the photograph or the actual person may – may or may not be involved in any crime. And it's just as important to rule them out as it is to say that that is the correct person." *Id.* at 487.

Petitioner argues that Officer Ezell's identification was suspect because the officer "only saw the individual he later identified as Petitioner for seconds," and because "Officer Ezell is Caucasian, [he was] . . . subject to inaccuracy due to cross-racial identification." Am. Pet. 19.

A reviewing court must "conduct a two-step inquiry into the constitutionality of a pre-trial identification procedure." *United States v. Givens*, 767 F.2d 574, 581 (9th Cir. 1985). First, this Court must determine whether the procedure was so "impermissively suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). This may occur when the procedure "emphasize[s] the focus upon a single individual," thereby increasing the "danger of misidentification." *United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985). Second, in determining whether identification evidence is reliable, even though suggestive, a court must weigh the totality of the circumstances. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). The indicia of reliability will be weighed against the "corrupting effect of the suggestive identification itself." *Id.*

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

Officer Ezell's identification of Petitioner from the single photograph shown to him by Officer Fenner was not "impermissively suggestive." *Simmons*, 390 U.S. at 384. Although an identification procedure involving only a single photograph may be suggestive, courts have found evidence obtained using even more suggestive procedures, such as one-on-one show-ups, constitutional. *See e.g., Bagley*, 772 F.2d at 492 (holding that a bank teller's identification of

defendant while he was handcuffed, seated in a police car, and surrounded by police was proper); *United States v. Kessler*, 692 F.2d 584, 585 (9th Cir. 1982) (holding that a bank teller's identification of defendant while he was handcuffed and accompanied by numerous officers referring to him as "suspect" was proper). Any "corrupting effect of the suggestive identification procedures" was outweighed by the indicia of reliability which include: the fact that Officer Ezell twice viewed Petitioner from a reasonably close distance, once when Petitioner drove past him in the Cadillac on Fiesta Avenue, and again when Petitioner exited the vehicle in front of the complex of duplexes; Officer Ezell's full attention was focused on identifying the driver of the Cadillac; his identification from the photograph was made within minutes of his eyewitness encounter with Petitioner; and, he testified that his recognition of Petitioner from the photograph was "immediate." *Biggers*, 409 U.S. at 199-200; RT 486. Thus, the record here supports the state court's conclusion that the single-photo identification procedure was proper and not unduly suggestive.

Petitioner's second argument is that the photo line-up of six persons shown to S-Mart's Security Guard, Matthew Bauer, was unduly suggestive because in the "photo line-up of African-American males . . . they all had unremarkable hair, with the exception of Petitioner." Am. Pet. 19. Petitioner contends that he "distinctly [stood] out in this photo line-up because he was the only African-American male with 'cornrows.'" *Id.*

Officer McBride testified that when he arrived on the scene at S-Mart following the robbery, Security Guard Bauer described one of the suspects as "a black male in his thirties, wearing a dark jacket, a knit cap and [carrying] a dark gun." RT 74. Bauer was unable to tell Officer McBride "what kind of hair [the suspect] had, whether it was long, short, bald, because he had a – knit cap on." Officer McBride testified that he went to the police station to make a report and while there, Armster Hampton's name "came up." *Id.* at 75-76. At trial, Officer McBride testified as follows:

Q:      Okay. And did you make a photo line-up based on the report that the

name Armster Hampton had come up as possibly one of the suspects?

A:    Yes.

Q:    And how did you do - - go about making a line-up?

A:    The computer that we have for taking photos of people that we book, if you put an individual's name in it, it pops up with his photo. And then the computer automatically scans itself to give you a list of pictures that are the approximate age that was listed on the individual when he was first put in.

*Id.* at 76. Officer McBride testified that he entered Petitioner's name and his photo came up depicting him wearing cornrows. *Id.* None of the other photographs that came up depicted persons wearing cornrows in their hair. Officer McBride testified that he "picked the best photo line-up [he] could of the pictures that the computer gave [him]." *Id.* at 77. All of the photographs were of the same size and quality, and each photographed suspect was of a similar age, race, and build as Petitioner. *Id.* Petitioner maintains that the line-up was "highly suspect" because "when only one person in a group of six photos has a characteristic that stands out, people will tend to pick the person who stands out." Am. Pet. 19.

The photo line-up prepared by Officer McBride was neither "impermissively suggestive" nor unreliable based on the totality of the circumstances. *Manson,* 432 U.S. at 114*; Simmons*, 390 U.S. at 384. Security Guard Bauer reported to Officer McBride that the suspect was wearing a cap, and that he could not tell what kind of hair style he wore. Therefore, Petitioner's hairstyle was not one of Bauer's considerations when he picked Petitioner out of the line-up. While Petitioner's hairstyle may have made his photo "stand out" from the others, it is not enough to make the line-up "impermissibly suggestive" under the circumstances here. Bauer made the photo identification within three hours of having been the victim of the armed robbery, and having observed the suspect from a distance of a car length away. Bauer was "positive" about his identification. Officer McBride testified that Josh Sanders also picked Petitioner's photo out of the line-up after viewing the line-up for about "five seconds." RT 83. Bauer's full attention was likely focused on the person pointing a gun at him while the robbery was taking place; and Bauer had training in identification. *Biggers*, 409 U.S. at 199-200; RT 246-248.

Petitioner has failed to show that the California Court of the Appeal's ruling with respect

to his third claim for relief was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## D

In Petitioner's fourth claim, he argues that his trial counsel was ineffective for (1) failure to make a hearsay objection to the testimony regarding Sanders's out-of-court identification of Petitioner, (2) failure to object to testimony that Petitioner was a "high-control parolee," and (3) failure to stipulate that Petitioner had a prior felony conviction.

## 1

Petitioner contends that his counsel should have objected to the prosecutor's reference to Josh Sanders's out-of-court identification of him from the photo line-up following the robbery as hearsay because Sanders did not testify. The record shows that Sanders, the second security guard at the market, did not testify at trial, but other witnesses testified about Sanders's identification in the photo line-up. Petitioner also contends his attorney should have objected to this testimony as hearsay. According to Petitioner, Sanders was the only African-American to identify him as a suspect in the robbery. Therefore, all identifications except Sanders's were cross-racial which means, according to Petitioner's theory, that they had an increased chance of error. Petitioner asserts that trial counsel's failure to object to evidence relating to the one witness for whom there was no cross-racial issue made his attorney's performance ineffective. Petitioner maintains that he was prejudiced by his attorney's deficient performance because "Mr. Sanders' alleged out-of-court identification was such strong evidence, which bolstered the other weak out-of-court identifications, it is reasonably probable that a more favorable determination would have resulted if this evidence had not been admitted." Am. Pet. 23.

Petitioner has not shown that his attorney's performance prejudiced the defense. *Strickland*, 466 U.S. at 687. First, the record does not support Petitioner's contention that the

23

photo identifications of him made by Security Guard Bauer and Officer Ezell were "weak." As discussed *supra*, there were ample indicia of reliability with respect to these identifications. Both witnesses testified at the trial, and were cross-examined by defense counsel. In addition to the photo identification evidence, Petitioner's finger prints were found on bottles retrieved from the scene of robbery. As further evidence of guilt, Petitioner's parole officer testified that Petitioner had been meeting regularly with him until immediately following the robbery when he failed to report as required.

Given the other evidence of Petitioner's guilt, Petitioner has not demonstrated that "but for" his trial counsel's alleged error concerning his failure to object to references to Josh Sanders's identification of him from a photo line-up, "the result of the proceeding would have been different." *Id*. at 694.

**2**

Petitioner claims that his trial counsel's failure to object to Officer Dittman's testimony that Petitioner was a "high control parolee" prejudiced Petitioner. Petitioner argues that "[t]here is absolutely no tactical reason why Mr. Williams would not object to Officer Dittman's testimony as there is no argument that such testimony helped Petitioner in any way." Am. Pet. 24. Not all testimony that is unhelpful to a defendant's case is objectionable. Petitioner's counsel made a motion in limine to exclude testimony by the parole officer that would indicate what crime Petitioner was convicted of that resulted in his parole. RT 33. The prosecutor argued that Officers Dittman's testimony concerning Petitioner's failure to report as required, following the robbery, was evidence of guilt. The trial court ruled that Officer Dittman could testify about his unsuccessful attempts to locate Petitioner, following the robbery. *Id.* at 34. After identifying himself as a parole agent for the State of California, Officer Dittman testified as follows:

    Q:    Do you know Armster Hampton?
    A:    Yes, I did.
    [Identifies the defendant as Armster Hampton.]

24

| | | |
|---|---|---|
| 1 | Q: | How do you know Armster Hampton? |
| | A: | Armster Hampton was assigned to my caseload approximately - - I believe |
| 2 | | it was either end of July or beginning of August, I think, 2001. |
| | Q: | And how does someone get assigned to your caseload? |
| 3 | A: | Well, I - - at the time he was what we call a high-control case. And I was |
| | | carrying a - - high-control caseloads. And - - |
| 4 | Q: | And so he was on parole? |
| | A: | Yes. |
| 5 | Q: | Okay. What - - what does it mean when someone's on parole? |
| | A: | It means that he had been at some state prison for a period of time and was |
| 6 | | released on parole. Everyone - - everyone that comes out of state prison |
| | | goes on parole. |
| 7 | | |

*Id.* at 624. Petitioner argues that this testimony was "inflammatory, because evidence that

Petitioner was on 'high-control' parole suggested that Petitioner had a propensity to commit

serious crimes." Am. Pet. 24. The prosecutor, however, did not probe further into what qualifies

as a "high-control case." It is possible that Petitioner's counsel did not object to Officer

Dittman's testimony for strategic reasons. It is possible that objecting to the testimony would

have drawn attention to the "high-control case" issue, whereas letting it go as a passing reference

could minimize the issue in the minds of the jurors. As discussed *supra*, the evidence of

Petitioner's guilt was overwhelming. It was sufficient to convict Petitioner, without the parole

agent's testimony that Petitioner was a "high-control parolee."

**3**

Petitioner's claim that his counsel was ineffective for failing to stipulate that he had prior

felony conviction also fails. Petitioner contends that "[h]ad the jury not learned of the nature of

Petitioner's prior recent felony, it is reasonably probable that a more favorable determination

would have resulted." Am. Pet. 26. Petitioner also argues that "Exhibits 2 and 3 (entered into

evidence), indicated that the victim of the prior commercial burglary was the same exact victim

in this case: S-Mart Foods." Am. Pet. 25.

In Count II of the indictment, Petitioner was "accused of having violated Section

12021(a)(1) of the Penal Code" which provides that anyone "convicted of a felony crime of

burglary of the second degree and who owns or has in his possession or under his custody or

1  control any pistol, revolver or other firearm is guilty of a violation of Penal Code Section
2  12021(a)(1), a crime." RT 937.

3      At a pre-trial hearing on May 1, 2003, the trial judge asked Petitioner "what are we going
4  to do with the priors here?" *Id.* at 44. Trial counsel indicated that he needed to discuss the
5  matter with Petitioner. *Id.* at 45-48. The next day, Petitioner's counsel informed the court:

6      First, the issue yesterday was raised - - or the question was posed to me by
7  the Court whether Mr. Hampton intended to enter a plea of guilty or not contest
    outside the presence of the jury to that count in the information as an ex-con in
    possession of a firearm on the date in question here.
8
    And I informed the Court that I had not felt well enough the previous
9  night to talk to Mr. Hampton, but I would do so last night about that issue.

10      I did do so about that issue. We've discussed it at some length,
    specifically the advantages we might gain or disadvantage we might - - or he
11  night suffer and the advantages he might gain depending on which way he went.

12      He has decided, and I think it is my advice as well, to let that count go to
    the jury. He will not plead to that count in terms of the guilty or no contest plea.
13  He'll simply let the jury hear the evidence in that count and make a decision on it.

14  *Id.* at 249-250. Because Petitioner decided not to plead guilty or no contest to Count II, the
15  prosecutor entered into evidence People's Exhibits 2 and 3 as proof "that the defendant has been
16  - - previously been convicted of a felony." *Id.* at 939. Petitioner instructed his counsel that he
17  did not want to plead guilty to the charge and his counsel followed that instruction. Therefore,
18  Petitioner has not demonstrated that his trial counsel was ineffective for failing to stipulate that
19  he had a prior conviction.

20      Petitioner also maintains that he was prejudiced because the portions of People's Exhibits
21  2 and 3, indicating that S-Mart was the victim in the prior burglary, had been covered by "white-
22  out tape" but some of the letters were still visible, making "S-Mart" easily visible under the
23  tape. *Id*. Petitioner has not pointed to any portion of the record indicating that the jury reviewed
24  or relied on these exhibits, or the portions that were redacted, in reaching its verdict.

25      **E**

26      Petitioner's fifth claim for relief is that his due process rights were violated when the trial

26

court did not give a unanimity instruction to the jury, or in the alternative, his counsel was ineffective when his attorney failed to require the prosecutor to elect which acts constituted the charged robbery.

"A faulty jury instruction will constitute a violation of due process only where the instruction by itself infects the entire trial to such an extent that the resulting conviction violates due process." *Jeffries v. Blodgett*, 988 F.2d 923, 937 (9th Cir. 1993) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973) (the question in a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process")). "Where the alleged error is the failure to give an instruction the burden on the petitioner is 'especially heavy.'" *Id.* (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977) ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.").

"Normally, a general instruction on the requirement of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications form the basis of the guilty verdict." *United States v. Payseno*, 782 F.2d 832, 835 (9th Cir. 1986). "[A] specific unanimity instruction is appropriate 'where the complex nature of the evidence, a discrepancy between the evidence and the indictment, or some other particular factor creates a genuine possibility of juror confusion.'" *Id.* at 836 (quoting *United States v. Frazin and Miller*, 780 F.2d 1461, 1468 (9th Cir. 1986)).

The trial court gave the following general unanimity instruction:

> In order to reach verdicts, all 12 jurors must agree to the decision and to any finding you have been instructed to include in your verdict. As soon as you've agreed upon a verdict so that when polled, each may state truthfully that the verdicts express his or her vote, have them dated and signed by your foreperson and then return them to this courtroom. Return any unsigned verdict forms. You'll be permitted to separate at the recesses. And during periods of recess, you must not discuss with anyone any subject connected with the trial. And you must not deliberate further on the case until all 12 of you are together and reassembled in the jury room.

RT 1040. Petitioner contends that a specific unanimity instruction should have been given

because, as the prosecution argued to the jury, the robbery charged in Count I could have been based on two acts. The first was Petitioner's act of aiding and abetting a robbery. The second was Petitioner's act of pointing a gun at the security officers, and then leaving with the stolen frozen chickens. Petitioner argues that because the jury could not agree on the gun enhancement as it related to count one, they would not have reached a unanimous decision as to what force was used to constitute the robbery had they been given a proper instruction.

This case presents none of the factors that require an instruction on unanimity regarding specific acts. The indictment alleged one count of second degree robbery and one count of felony possession of a weapon. The evidence at trial was not at variance with the indictment and supported a guilty verdict as to both counts in the indictment. The events taking place at the S-Mart on January 29, 2002 were one continuous robbery in progress. Neither the indictment nor the evidence created any ambiguity. The trial court's jury instructions did not deprive Petitioner of his federally guaranteed due process rights.

Similarly, Petitioner has not demonstrated that his counsel was ineffective for not requiring the prosecutor to elect which acts constituted the charged robbery. The robbery consisted of one continuous act rather than two distinct offenses. Therefore, no election was available for the prosecutor to make and Petitioner's counsel did not act unreasonably in failing to object to the prosecutor's characterization of the events that transpired.

**F**

Petitioner's sixth claim for relief is that there was insufficient evidence to support his robbery conviction. The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319

(1979). "[T]he dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982-83 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318). A petitioner in a federal habeas corpus proceeding "faces a heavy burden when challenging the sufficiency of evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen,* 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant the writ, the habeas court must find that the decision of the state court reflected an objectively unreasonable application of *Jackson* and *Winship* to the facts of the case.

When a state prisoner in federal habeas proceedings challenges the sufficiency of the evidence, a federal court must review the entire record. *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987); *see also Jackson*, 443 U.S. at 318 (implying that in federal habeas proceedings, federal courts have a duty to review the underlying facts for an insufficiency of the evidence claim as they do for claims relating to an alleged involuntary confession). It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. If the trier of fact could draw conflicting inferences from the evidence, the reviewing court will assign the inference that favors conviction. *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994). "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." *United States v. Dinkane*, 17 F.3d 1192, 1196 (9th Cir. 1994) (quoting *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991)). A federal court must determine the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16; *Chein*, 373 F.3d at 983.

As discussed *supra*, the record demonstrates that substantial evidence supported the jury's guilty verdicts. S-Mart Security Guard Bauer identified Petitioner from a photographic

1    line-up as the person who participated in the robbery, wielded a handgun, and drove the getaway

2    car. Petitioner's fingerprints were found on beer bottles left at the scene of the robbery. Officer

3    Ezell witnessed Petitioner driving the vehicle identified by Bauer as the getaway car, some

4    twenty minutes following the robbery. Police officers found a loaded handgun under the front

5    passenger seat of the vehicle Petitioner was seen driving the afternoon of the robbery, along with

6    mail bearing Petitioner's name and address on the front seat, and a package of "Pilgram's Pride"

7    frozen chicken on the back seat of the car. The brand of frozen chicken was the same brand of

8    frozen chicken, one of the brands taken during the robbery. After independently reviewing the

9    record, this Court concludes that the state court's decision was not "contrary to, or [did not]

10   involve[] an unreasonable application of, clearly established Federal law, as determined by the

11   Supreme Court of the United States," or "based on an unreasonable determination of the facts in

12   light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## G

14   Petitioner's seventh claim for relief is grounded upon the contention that the trial court's

15   imposition of an upper term sentence violated *Cunningham v. California*, 549 U.S. 270 (2007).

16   Petitioner was convicted on June 13, 2003 and sentenced on February 26, 2004 to an

17   aggregate term of 20 years and four months in prison. (Lodgment 15 vol. 2 at 518-520.) In his

18   appeal to the California Court of Appeal, Petitioner claimed that the trial "court erred in

19   imposing the upper term for robbery because the court relied upon facts not submitted to the jury

20   and proved beyond a reasonable doubt, thereby violating the principles enunciated in *Blakely,*

21   *supra*, 542 U.S. _____ [159 L. Ed. 2d 403]." *People v. Hampton*, No. C046365, 2005 Cal. App.

22   Unpub. LEXIS 5373, at *22. The Court of Appeal denied the claim, concluding that "[t]he

23   California Supreme Court rejected the identical claim in *People v. Black* (June 20, 2005,

24   S126182) _____ Cal.4th _____, and we are bound by that decision." *Id.* (citing *Auto Equity*

25   *Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455). Petitioner filed a petition for review in

26   the California Supreme Court, which was summarily denied on August 31, 2005. (Case No.

S135814).

On January 22, 2007, the United States Supreme Court decided *Cunningham v. California*, 549 U.S. 270 (2007). In *Cunningham*, the Supreme Court overruled *People v. Black*, 35 Cal. 4th 1238 (June 20, 2005), and held that California's determinate sentencing laws ["DSL"] violated a defendant's Sixth Amendment right to a trial by jury because they authorized the judge, not the jury, to find facts permitting an upper term sentence. *Cunningham*, 549 U.S. 270.[4]

Respondent contends in its answer, filed October 4, 2007, that *Cunningham* does not apply to the instant case because retroactive application of the new rule announced in *Cunningham* would violate the doctrine established in *Teague v. Lane*, 489 U.S. 288 (1989). Under *Teague*, a petitioner may not benefit from a rule that was adopted after the petitioner's conviction became final "if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* at 301 (emphasis in original). On June 9, 2008, however, the Ninth Circuit addressed the applicability of *Teague*, and held that *Cunningham* "did not announce a new rule of constitutional law" and therefore should be applied retroactively

_____

[4]Petitioner presented this claim in a petition for a writ of habeas corpus filed in the Superior Court, County of San Joaquin. On August 17, 2007, that court denied Petitioner's claim on the ground that

> *Cunningham* announced a new rule of law. As such, since the rule is procedural and is not a watershed rule, it is not to be applied retroactively on collateral review to cases already final when the rule was announced. [*In re Gomez*, 2d Dist. Aug. 7, 2007, __ Cal.Rptr.3d__, 2007 WL2247213 at p. 4.] Petitioner's conviction became final in 2005, hence *Cunningham* is inapplicable.

*In the Matter of the Petition of ARMSTER HAMPTON*, No. SF087198A, Superior Court, County of San Joaquin, August 17, 2007. On May 21, 2008, the California Supreme Court summarily denied Hampton's petition raising this claim.

on collateral review in cases where precedent existing at the time a conviction became final so dictated. *Butler v. Curry*, 528 F.3d 624, 639 (9th Cir. 2008). In *Butler*, the Ninth Circuit explained that, as of November 5, 2005, the date Butler's conviction became final, the Supreme Court's rulings in

> *Apprendi*, *Blakely*, and *Booker* [had] made "courts throughout the land" aware that sentencing schemes that raise the maximum possible term based on facts not found by a jury violate the constitutional rights of defendants. No principles of comity or federalism would be served by refusing to apply this rule to functionally indistinguishable state sentencing schemes on collateral review. *Cunningham* thus did not announce a new rule of constitutional law and may be applied retroactively on collateral review.

*Id.* (citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *United States v. Booker*, 543 U.S. 220 (2005)*, and *Blakely v. Washington*, 542 U.S. 296, 301 (2004), and quoting *Teague*, 489 U.S. at 306). Because Petitioner's conviction became final on February 21, 2006, the holding in *Cunningham* applies retroactively to collateral review of his sentence.

In *Cunningham*, the Supreme Court reviewed California's sentencing laws which provided that "an upper term sentence may be imposed only when the trial judge finds an aggravating circumstance" and "aggravating circumstances depend on facts found discretely and solely by the judge." 549 U.S. at 288. The court also noted that the relevant "statutory maximum" is "the middle term prescribed in California's statutes, not the upper term." *Id.* (citing *Blakely*, 542 U.S. at 303) ("'[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose s*olely on the basis of the facts reflected in the jury verdict or admitted by the defendant*.' (emphasis in original)"). Where the sentencing court imposes an upper or lower term, the sentence must be justified by "a concise statement of the ultimate facts" on which the departure rests. *Cunningham*, 549 U.S. at 279 n.9 (quoting Cal. Ct. R. 4.420(e)). In *Cunningham*, the court held that

> [b]ecause circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt, the DSL violates *Apprendi*'s bright-line rule: Except for a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable

1  doubt."

2  549 U.S. at 288-89 (citing *Apprendi*, 530 US at 490). (internal citations omitted).

3      The Court also explained that

4      the [California] Penal Code permits elevation of a sentence above the upper term
       based on specified statutory enhancements relating to the defendant's criminal
5      history or circumstances of the crime. *See, e.g.*, Penal Code § 667 et seq (West
       1999); § 12022 et seq. (West 2000 and Supp. 2006). *See also Black*, 35 Cal. 4th,
6      at 1257, 113 P. 3d, at 545. Unlike aggravating circumstances, statutory
       enhancements must be charged in the indictment, and the underlying facts must
7      be proved to the jury beyond a reasonable doubt. Penal Code § 1170.1(e) (West
       2004); Black, 35 Cal. 4th, at 1257, 113 P. 3d, at 545. A fact underlying an
8      enhancement cannot do double duty; it cannot be used to impose an upper term
       sentence and, on top of that, an enhanced term. Penal Code § 1170(b). Where
9      permitted by statute, however, a judge may use a fact qualifying as an enhancer to
       impose an upper term rather than an enhanced sentence. *Ibid*.; Rule 4.420(c).

10

11  549 U.S. at 280-81.

12      In *Butler*, the Ninth Circuit held that the petitioner's Sixth Amendment rights had been

13  violated by a California trial court when the "maximum possible term was raised based on facts,

14  other than a prior conviction, that were not admitted or proved to a jury beyond a reasonable

15  doubt." 528 F.3d at 648. After making that determination, the Ninth Circuit examined the two

16  aggravating factors that had formed the basis for the aggravated sentence to determine whether

17  the sentencing error was harmless. *Id* at 648 (citing *Washington v. Recuenco*, 548 U.S. 212

18  (2006) (holding that sentencing errors are subject to harmless error analysis). An error is not

19  harmless where it "had a substantial and injurious effect on [the] sentence." *Id.* (quoting

20  *Hoffman v. Arave*, 236 F.3d 523, 540 (9th Cir. 2001) (internal quotation marks omitted). "Under

21  that standard, [relief must be granted] if we are in 'grave doubt' as to whether a jury would have

22  found the relevant aggravating factors beyond a reasonable doubt." *Id.* (quoting *O'Neal v.

23  McAninch*, 513 U.S. 432, 436 (1995). "Grave doubt exists when, 'in the judge's mind, the

24  matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of

25  the error.'" *Id.* (quoting *O'Neal*, 513 U.S. at 435). This Court's inquiry is directed at the

26  evidence presented to the jury at trial and at sentencing proceedings. *Id.* More importantly, the

1 Ninth Circuit standard requires this Court to address directly the aggravating factors that were

2 actually used in Petitioner's sentence. *See e.g. Butler*, 528 F.3d at 649 (reviewing each

3 aggravating factor forming the basis for the upper term sentence separately). If the trial judge

4 used his own factual determinations to impose an upper term, other than the fact of a prior

5 conviction, the Petitioner's Sixth Amendment rights have been violated.[5]

6

7

8 [5]California Rule of Court 4.421 provides:

9 Circumstances in aggravation include factors relating to the crime and factors relating to the defendant.

10 (a)     Factors relating to the crime, whether or not charged or chargeable as enhancements include that:

11

12     (1)     The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness;

13

14     (2)     The defendant was armed with or used a weapon at the time of the commission of the crime;

15     (3)     The victim was particularly vulnerable;

16     (4)     The defendant induced others to participate in the commission of the crime or occupied a position of leadership or dominance of other participants in its commission;

17

18     (5)     The defendant induced a minor to commit or assist in the commission of the crime;

19

20     (6)     The defendant threatened witnesses, unlawfully prevented or dissuaded witnesses from testifying, suborned perjury, or in any other way illegally interfered with the judicial process;

21

22     (7)     The defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed;

23

24     (8)     The manner in which the crime was carried out indicates planning, sophistication, or professionalism;

25

26     (9)     The crime involved an attempted or actual taking or damage of great monetary value;

*Butler*, 528 F.3d at 639, 645.

In *Butler*, the trial judge imposed an aggravated upper term sentence for two reasons: first, the trial court concluded that the victim was particularly vulnerable because she was attacked from behind, and second, the trial court made a conclusive finding that Petitioner was on probation at the time he committed the crime. *Id.* at 643. Based upon the evidence presented at trial, the Ninth Circuit concluded that the jury would have found beyond a reasonable doubt that the victim was attacked from behind. *Id.* at 649. There was no evidence, however, that the victim was "particularly vulnerable," or that she was "less able than other victims to ward off

      (10)    The crime involved a large quantity of contraband; and

      (11)    The defendant took advantage of a position of trust or confidence to commit the offense.

      (12)    The crime constitutes a hate crime under section 422.55 and:

            (A) No hate crime enhancements under section 422.75 are imposed; and

            (B) The crime is not subject to sentencing under section 1170.8.

            (Subd (a) amended effective May 23, 2007; previously amended effective January 1, 1991, and January 1, 2007.)

(b)  Factors relating to the defendant include that:

      (1)    The defendant has engaged in violent conduct that indicates a serious danger to society;

      (2)    The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness;

      (3)    The defendant has served a prior prison term;

      (4)    The defendant was on probation or parole when the crime was committed; and

      (5)    The defendant's prior performance on probation or parole was unsatisfactory

            (Subd (b) amended effective May 23, 2007; previously amended effective January 1, 1991, and January 1, 2007.)

(c)  Any other factors statutorily declared to be circumstances in aggravation.

attacks because of any . . . disability or incapacitation." *Id.* at 649-650. Thus, the Ninth Circuit was "left with 'grave doubt' as to whether a jury would have found, beyond a reasonable doubt and based solely on the circumstances of being attacked from behind, that [the victim] was [] 'particularly vulnerable.'" *Id.* at 651. However, under California law, only one aggravating factor is necessary to award the upper term, and therefore, any error is harmless if it is not prejudicial as to just one of the aggravating factors at issue. *Id.* at 648; Cal. R. Ct. 4.420.

As to the second factor in *Butler*, the Ninth Circuit held that "the fact of being on probation at the time of a crime does not come within the 'prior conviction' exception and must be pleaded in an indictment and proved to a jury beyond a reasonable doubt." *Id.* at 646-47; *See also Apprendi*, 530 U.S. at 490. "The fact that a defendant was on probation at the moment of the current crime . . . is not reflected in the documents of a prior conviction nor, for that matter, may it be conclusively inferred from those documents." *Id.* at 645-46. However, the court was unable to determine from the record on appeal whether the prosecution presented evidence at sentencing sufficient to demonstrate the defendant's probationary status. Because the court was unable to determine whether a jury would have found Butler's probationary status beyond a reasonable doubt, the matter was remanded for further fact finding. *Id.* at 646-648.

Here, a jury convicted Petitioner of one count of second degree robbery (Cal. Penal Code § 211) and one count of being a felon in possession of a firearm (Cal. Penal Code § 12021(a)). The jury failed to reach a verdict as to whether Petitioner used a weapon during the robbery. The court imposed the upper term sentence of five years for the robbery, the base offense, and doubled the sentence to ten years pursuant to Cal. Penal Code § 1170.12(d), because Petitioner had a prior serious felony conviction, or "strike." The court sentenced Petitioner to eight months (one third the midterm sentence) for the conviction for being a felon in possession of a weapon in violation of Cal. Penal Code § 12021(a). That sentence was also doubled due to Petitioner's strike conviction prior pursuant to Cal. Penal Code § 1170.12(d). Petitioner was sentenced to five years for having committed a prior serious felony, pursuant to Cal. Penal Code § 667(a).

Petitioner was also sentenced to one year each on six prior prison terms, pursuant to Cal. Penal Code § 667(b).  The court stayed two of the one-year prison terms.  Petitioner was sentenced to a total of 20 years and four months.

In sentencing Petitioner to the upper term of five years on the base offense, the court cited five aggravating factors in support of the sentence.  The trial court stated:

> I've selected the upper term because [Petitioner] has engaged in violent conduct in his past, indicating that he's a serious danger to society.
>
> The manner of his particular crime does show some sophistication, some planning, some coordination with an accomplice.  Drive up, park in the handicap spot, and some guy runs in and loads up stuff brazenly.  That's doing this because he knows there's a getaway driver out in front.  So there's – there's some planning with regard to that.
>
> His record, including misdemeanors and felonies, is – is very long, very consistent, and has serious conduct in it.  He served a number of prior prison terms, at least five separate prior prison terms, one of them is the strike, and four of the other ones are for other offenses.
>
> He was on parole at the time of this offense.  He was actually on felony probation as well for burglary from the same victim's store at the time of the events.  His prior performance on parole and probation has been unsatisfactory.  Those are all the reasons I'm using to fix this an upper term case.

RT 1126.

**Aggravating Factor No. 1: Violent conduct that indicates a serious danger to society**

The jury was unable to reach a verdict as to whether Petitioner used a gun in the commission of the robbery for which he was convicted.  Evidence was presented at trial showing that Petitioner had a prior felony conviction, but there was no direct or specific evidence presented indicating that Petitioner had a violent past.  Therefore, the trial judge presumably relied upon the evidence of Petitioner's prior convictions in finding that Petitioner had "engaged in violent conduct in his past, indicating that he's a serious danger to society."

Petitioner waived his right to a jury trial on the existence of his prior convictions and prior prison terms served, and agreed to have the court determine the truth of the allegations.  RT 1046-47.  The trial court found beyond a reasonable doubt that Petitioner had six prior

convictions. RT 1063. Petitioner's prior convictions were (1) assault with a firearm (1988), (2) driving a vehicle while knowingly permitting another person to discharge a firearm from the vehicle (drive by shooting) (1990), (3) felon in possession of a firearm (1992), (3) evading police (1993), (4) felon in possession of a firearm (1993), (5) commercial burglary (1999), (6) possession of methamphetamine for sale/transportation (2000). This evidence supports the trial court's conclusion that Petitioner had demonstrated violent conduct, indicating that he is a serious danger to society. Accordingly, the trial court did not violate Petitioner's Sixth Amendment rights in imposing the upper term, based upon the court's findings, beyond a reasonable doubt, that Petitioner posed a serious danger to society.

Petitioner also argues that the trial court violated California's "dual use" rule when it used the same prior convictions to establish as factors in aggravation that he had committed violent acts in the past, and that he had served prior prison terms, *see* Cal. Ct. R. 4.421(b)(3) (listing the fact that "defendant has served a prior prison term" as an aggravating factor), and also to impose multiple enhancements pursuant to Cal. Penal Code § 667.5 (a) and (b). A trial court may not use the same fact on which an enhancement is based to impose an aggravated term. Cal. Penal Code § 1170 (b) (a court may not impose an upper term sentence "by using the fact of any enhancement upon which sentence is imposed under any provision of law"); *see also Cunningham,* 549 U.S. at 280-81 ("A fact underlying an enhancement cannot do double duty; it cannot be used to impose an upper term sentence and, on top of that, an enhanced term."); *People v. Lambeth*, 112 Cal. App.3d 495, 497-499 (1980) (California's "dual use" rule prohibits a court from basing an upper term on a fact which is either an element of the underlying offense or is the basis for an enhancement).

Were the "serious danger to society" factor the only aggravating factor upon which the trial court based its imposition of the upper term sentence, the record would support Petitioner's contention. However, only one aggravating factor is necessary to award the upper term so any error is harmless if it is not prejudicial as to just one of the aggravating factors at issue. *Butler v.*

*Curry*, 528 F.3d at 648; Cal. R. Ct. 4.420.

**Aggravating Factor No. 2: The manner in which the crime was carried out indicates planning, sophistication, or professionalism**

The trial court's conclusion that "[t]he manner of [t]his particular crime does show some sophistication, some planning, some coordination with an accomplice" is problematic under *Cunningham*, because none of these facts were found to be true beyond a reasonable doubt. At the sentencing hearing, Petitioner's counsel objected to that factor and argued that the crime was instead "very simple. . . [w]hat this person did was went into S-Mart Foods, loaded up a cartful of groceries. . . walked right past the cashier, out the door. . . that doesn't indicate sophistication or planning. Anybody can do that." RT 1120. The California Court of Appeal agreed, referring to this case as "a less-than-sophisticated robbery of a grocery store." *People v. Hampton*, No. C046365, 2005 Cal. App. Unpub. LEXIS 5373, at *2-5. Based upon the evidence presented at trial, it is not clear whether a jury would have found, beyond a reasonable doubt and based solely on the circumstances enumerated by the trial judge at the sentencing hearing, that this crime was carried out with "planning, sophistication, or professionalism." However, any error here is harmless so long as the trial court based its upper term sentence upon another permissible factor.

**Aggravating Factor No. 3: The defendant has served prior prison terms**

As with the first aggravating factor, use of the fact of Petitioner's prior prison terms to impose the upper term and also to impose multiple enhancements pursuant to Cal. Penal Code § 667.5 (a) and (b) would appear to violate California's "dual use" rule. However, because the trial court properly relied on other aggravating factors in support of the upper term sentence, this error, if any, is harmless.

**Aggravating Factor Nos. 4 & 5: The defendant was on parole when the crime was committed; and, the defendant's prior performance on parole was unsatisfactory**

Evidence presented at trial supports the last two aggravating factors enumerated by the trial judge for imposing the upper term sentence. Officer Dittman testified that he was

1   Petitioner's parole officer in January 2002 when the crime of conviction was committed.  RT

2   624-630.  He also testified that Petitioner failed to report to his parole officer meetings as

3   required between January 30, 2002 and December 31, 2002.  *Id.*  Officer Dittman's testimony

4   was credible.  Therefore, there is little room for doubt that had these two factors been presented

5   to a jury, the jury would have found the relevant aggravating factors true beyond a reasonable

6   doubt.  *Butler*, 528 F.3d at 651.

## VI

## Conclusion

Accordingly, IT IS HEREBY ORDERED that Petitioner's application for a writ of habeas corpus is DENIED.

*/////*

DATED: March 25, 2009

/s/ Arthur L. Alarcón
UNITED STATES CIRCUIT JUDGE
Sitting by Designation